# United States Court of Appeals
## For the First Circuit

No. 10-1125

LUCAS NICOLSON,

Petitioner, Appellee,

v.

ERICA PAPPALARDO,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Lipez and Howard,

Circuit Judges.

Deena Jo Schneider with whom Schnader Harrison Segal & Lewis
LLP, Peter W. Evans and Givertz, Hambley, Scheffee & Lavoie, P.A.
were on brief for appellant.
Stephen J. Cullen with whom Kelly A. Powers, Joshua J.
Gayfield and Miles & Stockbridge P.C. were on brief for appellee.

April 30, 2010

**BOUDIN**, **Circuit Judge**.  This is an appeal from a proceeding in the district court under the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), which governs certain child custody disputes.  Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501.  We begin with a description of the background events, drawn from the record in the district court, and of the proceedings that led to the present appeal.

Erica Pappalardo, an American citizen, and Lucas Nicolson, an Australian serving as a soldier in his country's armed forces, began a relationship in Australia when Pappalardo was traveling there.  Pappalardo moved in with Nicolson and became pregnant.  After she returned to the United States, Nicolson proposed marriage over the telephone, and she accepted and returned to Australia where the couple was married in August 2008.  They moved to Townsville, where Nicolson was posted for service in the Australian Defense Force.

In November 2008, when Pappalardo was eight months pregnant, Nicolson told her he did not love her and was unsure whether marrying her had been a mistake.  Pappalardo, upset, told Nicolson she wanted to move back to the United States as soon as she and the child were medically cleared to travel.  But the couple continued to live together in Australia; Pappalardo says they did

so, despite continuing marital problems, because she was financially dependent on Nicolson and could not travel with a baby until the baby was three months old.

Their daughter, S.G.N., was born in December 2008. Until March 2009, all three resided together in Townsville. That month, Nicolson and Pappalardo arranged for a U.S. passport for S.G.N.-- Nicolson says merely so S.G.N. could visit Pappalardo's family in the United States, but Pappalardo says Nicolson knew of and reluctantly acceded to her plans to move herself and S.G.N. permanently to the United States.

In exchange for Nicolson's signing for the child's passport, Pappalardo agreed to give the marriage another chance. Nicolson says this trial was for three months, but Pappalardo denies making any duration promises. She also claims that Nicolson did nothing in the following months to repair the marriage.

The couple made preparations for Pappalardo and S.G.N.'s travel, packing or shipping a large quantity of belongings including S.G.N.'s medical records and transferring title to the couple's car from Pappalardo to Nicolson. On March 29, 2009, Nicolson drove Pappalardo and S.G.N. to the airport to fly to Sydney where Pappalardo's mother would assist in their travel to the United States. The next day, in Sydney, Pappalardo mentioned to Nicolson's mother and sister that she did not plan to return.

Nicolson's mother informed Nicolson, who immediately flew to Sydney and angrily confronted Pappalardo at her hotel about her intentions; Pappalardo said she was unsure. He met with an attorney that day but told Pappalardo the next day that he would not pursue legal action because he wanted her to return with S.G.N. on her own accord. She said she was open to working on their relationship. On April 2, 2009, she and S.G.N. flew to the United States.

At first, the couple communicated regularly via e-mail and Internet video chat. At Nicolson's request, Pappalardo reserved a late May 2009 return airline ticket to Australia for herself, with S.G.N. to sit on her lap. Pappalardo claims Nicolson began harassing her with profane phone calls, text messages, and threats. On May 4, after meeting with a counselor, Pappalardo had an "epiphany" that their marriage would never work and notified Nicolson that she and S.G.N. would not return to Australia.

On May 14, 2009, Pappalardo filed a complaint in Maine state court seeking an ex parte temporary order for protection from abuse ("PFA") against Nicolson, which was granted immediately and served on Nicolson on June 12. In the meantime, Nicolson filed an Application for Return--not then disclosed to Pappalardo--with the Central Authority of Australia, pursuant to the Hague Convention. The Convention, to which the United States and Australia are

parties, can result in an order requiring the return to its habitual residence of a child wrongfully taken or retained.

On September 4, 2009, Nicolson's Maine attorney attended the hearing on the final PFA order, but Nicolson did not attend and was denied permission to testify telephonically. The court was not told that Nicolson was pursuing Hague Convention relief because (Nicolson says) he was so advised by Australian authorities in case it might prompt Pappalardo to flee with S.G.N. Instead, his attorney and Pappalardo's lawyer agreed to entry of a PFA order dated September 4, 2009, which is central to this appeal.

The order recited in a checked box with form language that "[t]he parties have agreed to the following Order, which is made without findings of abuse" (the phrase "w/o admission" was added in handwriting). Further checked boxes limited Nicolson's contact with Pappalardo save that in the checked box form provision dealing with "temporary parental rights and responsibilities (custody) of minor child(ren)," Nicolson was given limited Internet contact with the child. That checked box reads as follows (the underlined portion being handwritten):

> The plaintiff [Pappalardo] is awarded temporary parental rights and responsibilities (custody) of minor child(ren), whose names and dates of birth are as follows: [S.G.N.] (DOB 12-22-2008) TO BE AMENDED BY COURT OF COMPETENT JURISDICTION. PA OBO [S.G.N.] TO BE DISMISSED UPON ISSUANCE OF FINAL FM ORDER.
>
> The defendant's rights of contact are limited as follows: pending further order in Family

-5-

> Matter, Defendant [Nicolson] may have reasonable contact via Skype or other video conference system at least once per week and regular updates about child by regular e-mail contact. In Emergency phone contact is permitted. Defendant is granted access to records of child.

A closing form paragraph, on the second page of the form order, stated that the order would remain in effect for a specified period--in this case, a date two years hence was inserted--"unless earlier modified or vacated by order of court or, with respect to Child Support or Parental Rights and Responsibilities, by a Magistrate." On October 2, 2009, Pappalardo filed a suit for divorce in the state court.

On October 22, 2009, Nicolson filed in federal district court in Maine a petition seeking return of the child to Australia, claiming under the Hague Convention that Pappalardo had wrongfully retained S.G.N. in the United States.[1] The Convention provides for the return of a child whose removal or retention in another country is "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention" and those custody rights were actually exercised at the time. Art. 3(a).

---

[1] The International Child Abduction Remedies Act, which implements the Hague Convention, affords the federal district court jurisdiction over Nicolson's petition. 42 U.S.C. § 11,603(a) (2006).

-6-

Under the Convention, the petitioner--in this case Nicolson--bears the burden of proving wrongful removal or retention by a preponderance of the evidence. 42 U.S.C. § 11,603(e)(1). To do this, he must show (1) that S.G.N.'s habitual residence was Australia immediately prior to the retention, (2) that he had custody rights over S.G.N. at the time, and (3) that he was exercising those custody rights. Hague Convention art. 3. In this case, Pappalardo challenged only the first of the three pre-conditions, but she also claimed that Nicolson had consented to or acquiesced in the child's retention, two separate exceptions under the Convention.

The district court, in an extensive decision following the taking of evidence, concluded that S.G.N.'s habitual residence was Australia, that Nicolson had possessed and retained joint custody rights, and that he had not consented or acquiesced to Pappalardo's permanent retention of S.G.N. in the United States through the state court proceedings or otherwise. The court ordered S.G.N.'s return to Australia. Pappalardo appealed to this court which granted a temporary stay but expedited this appeal.

On this appeal, the issues of habitual residence, consent and acquiescence require discussion, and we begin with habitual residence. The Hague Convention does not define "habitual residence," but the majority of federal circuits to consider it have adopted an approach that begins with the parents' shared

intent or settled purpose regarding their child's residence.[2]  In an unpublished opinion, this circuit has employed that approach. Zuker v. Andrews, No. 98-1622, 1999 U.S. App. LEXIS 6964, at *2-3 (1st Cir. Apr. 9, 1999).

On appeal Pappalardo argues only that S.G.N. never formed an initial habitual residence in Australia.  Sensibly, she does not claim that, assuming S.G.N.'s habitual residence was Australia prior to the move back to Maine, merely retaining the child in Maine without Nicolson's consent or acquiescence would establish a new habitual residence.  So we are not concerned with the standards for evaluating such a claim.  Cf. Robert v. Tesson, 507 F.3d 981, 990-91 (6th Cir. 2007) (concerning differing tests on change of habitual residence).

Pappalardo's thesis is that she never shared Nicolson's intent for S.G.N. to reside habitually in Australia because the couple's marital relationship broke down and Pappalardo formed the intent to leave with S.G.N. before the child was born.  The district court, however, found that while their marriage was "fraught with difficulties from the beginning" and "[t]here were numerous conversations about the viability of the marriage, both

---

[2]Barzilay v. Barzilay, No. 09-2358, 2010 U.S. App. LEXIS 6918, at *13 (8th Cir. Apr. 2, 2010); Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009); Koch v. Koch, 450 F.3d 703, 715 (7th Cir. 2006); Gitter v. Gitter, 396 F.3d 124, 131-32 (2d Cir. 2005); Mozes v. Mozes, 239 F.3d 1067, 1076-81 (9th Cir. 2001); Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995).

before and after S.G.N. was born," "[t]hey lived together as a married couple . . . from the time of their marriage until March 29, 2009" and "shared responsibilities for S.G.N." until that time, when she was over three months old.

Knowing nothing of private reservations, an objective observer would view S.G.N. as an Australian resident: her father was a citizen of the country and obliged to stay there during his term of service; her mother, being pregnant, had returned to Australia to marry him; they had married there and were living together there at the time of S.G.N.'s birth; and S.G.N. was born there and lived there for several months with both her parents. Judged by Nicolson's actions incident to Pappalardo's departure, Pappalardo's intent to move permanently to the United States seemingly became manifest and definitive only at that time.

As against this, Pappalardo's position rests centrally on her earlier pre-birth declaration to Nicolson that she would move back to the United States and her testimony that her subjective intent at the time of the birth was not to remain in Australia. She relies on the proposition that "[w]here the parents' relationship has broken down . . . . contemporaneous[ly] with the birth of the child, no habitual residence may ever come into existence." Delvoye v. Lee, 329 F.3d 330, 333 (3d Cir. 2003). But the circumstances in that case were strikingly different.

In Delvoye, the mother had traveled to a foreign country merely to save expenses by giving birth there instead of in her home country and with the intention from the outset of staying only a short time.  Id. at 334.  Here, the marriage was certainly troubled at the time of S.G.N.'s birth, but the evidence did not require, and the district judge did not make, a finding that a definitive breakdown had occurred before or at the time of the child's birth.  Pappalardo's behavior even after the birth remained equivocal as to her ultimate plans.

Although Pappalardo told Nicolson's mother that she was not going to return from Maine, she was apparently willing to consider a reconciliation even after her arrival in the United States.  In fact, she agreed before leaving to give the marriage a further trial and, in Maine, reserved a May 2009 ticket to return to Australia.  By her own testimony, it was after she returned to the United States--and seemingly in part because of Nicolson's alleged abusive behavior--that she reached an "epiphany" that the marriage was over.

Pappalardo assumes that, if she were credited with a fixed subjective intent to take her daughter permanently to the United States, then all other circumstances would be irrelevant.  But "[s]tanding alone, of course, the mother's intent that the child should one day live in the United States could not support a finding of habitual residence."  Ruiz v. Tenorio, 392 F.3d 1247,

-10-

1253 n.3 (11th Cir. 2004).  Ruiz accords with our own view that the law is less rigid than Pappalardo assumes and that tests of habitual residence must be applied to the circumstances of the case.[3]

It is not easy here to attach an abstract label to a complex of discrete facts, some of which push each way, especially as we are concerned with the subjective intent of two individuals and the objective circumstances of three.  The district judge's raw fact findings can be reversed only for clear error, Whallon v. Lynn, 230 F.3d 450, 454 (1st Cir. 2000), and in this circuit some deference might also be given to his application of the standard.  E.g., Bolton v. Taylor, 367 F.3d 5, 7-8 & n.1 (1st Cir. 2004).  We think the district court's decision on this issue must stand.

A child retained abroad over objection must be returned to his or her state of habitual residence unless the respondent can establish one of the provided-for defenses or exceptions.  Hague Convention arts. 12, 13; Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996).  Pertinently, the district court is not bound to order the return of S.G.N. if Pappalardo establishes by a

---

[3]Having moved back to Australia to live with Nicolson, arguably Pappalardo's own habitual residence became Australia, notwithstanding her later developed intention to relocate at a future point to Maine.  Cf. Holder v. Holder, 392 F.3d 1009, 1020 (9th Cir. 2004) ("[I]f a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country."); Cooper v. Casey, (1995) 18 Fam. L.R. 433 (Austl.) (same).  We need not pursue the point.

preponderance of the evidence that Nicolson "had consented to or subsequently acquiesced in [Pappalardo's] removal or retention" of S.G.N.  Hague Convention art. 13(a); 42 U.S.C. § 11,603(e)(2)(B). The exceptions are "narrow" and must be narrowly construed.  42 U.S.C. § 11,601(a)(4); State Department Text and Legal Analysis of the Hague International Child Abduction Convention, 51 Fed. Reg. 10,493, 10,509 (Mar. 26, 1986).

We begin with consent, an inquiry that focuses on Nicolson's intent prior to the child's retention, Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005); Pappalardo's acquiescence claim on appeal rests on the consent order entered after the retention. Consent may be evinced by the petitioner's statements or conduct, which can be rather informal.  Id.; Gonzalez-Caballero v. Mena, 251 F.3d 789, 793-94 (9th Cir. 2001).  Pappalardo claims that a variety of conduct and circumstances establish that Nicolson both knew and consented to S.G.N.'s permanent departure from Australia.

Pappalardo points to several facts already mentioned-- Nicolson's participation in extensive preparations for her and S.G.N.'s trip and the transfer of the car's title--and to others: Nicolson's invitation to a male friend to move into the house after his family's departure, Nicolson's mother's e-mails expressing sadness at losing the child, Nicolson's Internet posts on Facebook.com that described S.G.N.'s departure as "my loss of my family" and "his baby girl ha[ving] been ripped from him" and his

-12-

change of status on that website from "married" to "single" (which he quickly changed back), and various other statements.[4]

But Nicolson can also point to circumstances in his favor consistent with his testimony that he believed Pappalardo and S.G.N. would return to Australia and did not consent to more than a temporary stay for S.G.N. in the United States. These include his immediate arrangement for leave to fly to Sydney to confront Pappalardo and seek legal advice after his mother informed him of Pappalardo's intentions, Pappalardo's statements that she was open to continuing to work on their marriage, his efforts to persuade her to return thereafter and her reservation of a ticket to return.

Nowhere is it claimed that Nicolson expressly agreed that the child could move permanently to the United States. His behavior is at least as consistent with that of a man who wanted to continue the marriage and, therefore, to avoid forcing a final choice on his wife. If the district court had found consent, it might not have been easy to find this clear error or an unreasonable assessment; but, in finding that Pappalardo has not carried her burden to show consent to a permanent relocation of the child, the finding is no less protected against reversal.

_____

[4]Pappalardo highlights Nicolson's admissions that he told Pappalardo he would "never keep [her in Australia] against [her] will," that they had talked about S.G.N. leaving with her, and--after their confrontation in Sydney--that he told her he "wasn't going ahead with the lawyer because [he] wanted her to come back with [S.G.N.] on her own accord."

The outcome of the case, therefore, turns finally on acquiescence--an issue that the district court, in a generally thorough opinion, moved past rather quickly (perhaps reasonably so given the general language of American cases on the issue). But we view most of the cases as distinguishable and not directly answering the question whether Nicolson acquiesced to Pappalardo's retention of S.G.N. in the United States by agreeing--through his attorney--to the Maine state court's entry of the PFA order.

The district court concluded that the PFA order could not bar Nicolson's petition because the Hague Convention takes precedence over state custody determinations. True, under the Convention "[t]he sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention." Art. 17 (emphasis added). The Convention, after all, confers the privilege of deciding custody on the state of habitual residence. Arts. 1(b), 16, 19.

But it remains a defense to the Convention's requirement of return to show that the party invoking a right to have the child returned "acquiesced" in retention; and it is hard to think of a more formal acquiescence than entering into a consent order providing that the other parent be awarded custody. The consent order in this case provided only for temporary custody but, if it were read as agreeing to let the Maine courts determine final

-14-

custody (as Pappalardo claims), we would think that this was an acquiescence or, alternatively, a waiver of Hague Convention rights. Cf. Journe v. Journe, 911 F. Supp. 43, 47-48 (D.P.R. 1995) (voluntary dismissal of custody action treated as waiver).

The district court cited federal cases, and others exist, that treat acquiescence as a pure subjective intent inquiry,[5] and surely Nicolson had no subjective intent in the state court proceeding to have S.G.N. remain in the United States or to confer final authority to decide her custody on an American court. After all, he was privately seeking Hague Convention relief through the Australian Central Authority at the very time he participated in the state court proceeding, and he began his federal district court case shortly afterwards.

But the federal cases mostly involve attempts to characterize ambiguous conduct as a basis for inferred acquiescence; by contrast, a clear and formal consent order by the non-U.S. parent agreeing to let a state court decide final custody would, both linguistically and for policy reasons, warrant treatment as acquiescence under the Hague Convention. In fact, American case law seems to recognize the need for exceptions to the subjective intent standard and some American cases (in dictum) and a United Kingdom case (as a direct holding) strongly support our

---

[5]E.g., Baxter, 423 F.3d at 371; Antunez-Fernandes v. Connors-Fernandes, 259 F. Supp. 2d 800, 813 (N.D. Iowa 2003); Pesin v. Osorio Rodriquez, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999).

-15-

view that a clear-cut formal consent order would be sufficient for acquiescence.

Importantly, in Re: D (Abduction: Acquiescence), (1998) 1 Fam. 686 (Fam. Div.), aff'd, (1998) 2 F.L.R. 335 (C.A.) (U.K.), a United Kingdom judge found acquiescence in a father's agreement, through his attorney, to a Welsh custody court's making of a residence order from which he did not appeal. See In re H. and Others, [1998] A.C. 72 ("[T]he wronged parent may sign a formal agreement that the child is to remain in the country to which he has been abducted."); Friedrich, 78 F.3d at 1070 (stating that acquiescence includes "a convincing written renunciation of rights").[6]

However, we think that it remained Pappalardo's burden to show that an unambiguous consent order did exist in this case. As already explained, the policy of the Convention is return to the child's habitual residence, the burden is Pappalardo's to prove a defense, and the exceptions are to be narrowly construed. In this instance we think the consent order is not the unequivocal "acquiescence" or waiver that it might first appear; at best, the order is, on the point in question, a cryptic collection of printed

---

[6]See also In re H. and Others (Minors) (Abduction: Acquiescence), [1998] A.C. 72 (H.L. 1997) (appeal taken from Eng.) (U.K.) (stating general rule of subjective intent but recognizing "strictly exceptional cases" in which a petitioner's words or actions might constitute acquiescence regardless of his intent because they show "clearly and unequivocally" that the wronged parent is not insisting on the child's summary return).

and handwritten phrases that yields no single answer as to who is to decide on permanent custody.

This not surprising.  A protection from abuse order is primarily concerned with dealing with an immediate threat of abuse and, where there are minor children, making arrangement for temporary custody.  This order addressed both of those issues and, after providing for temporary custody, incorporated this handwritten language: "TO BE AMENDED BY COURT OF COMPETENT JURISDICTION.  PA OBO [S.G.N.] TO BE DISMISSED UPON ISSUANCE OF FINAL FM ORDER."  The abbreviations can be deciphered--although not with perfect assurance[7]--but how to read the sentences in relation to a final custody determination is even less clear.

Pappalardo would read the sentences as reflecting an agreement that a final custody determination be made only by the Family Division of the Maine state court.  On this reading, the reference to a "court of competent jurisdiction" in the former sentence might refer merely to the possibility of amending the temporary custody order by order of any of several deciders

---

[7]Read in conjunction with the caption, "PA OBO [S.G.N.]" appears to be "protection from abuse on behalf of" the child in the case.  "FM" appears to mean "family matter" and is likely a shorthand reference to an action over which the Family Division of the Maine District Court has jurisdiction and which is governed by the Family Division's procedural rules, Me. Rev. Stat. Ann. tit. 4, § 183 (2009); Me. R. Civ. P. 100A (2009), but the Maine statute and rules seem to use "family matter" as a generic term for the nature of the proceeding and conceivably the order here is using the phrase generically, that is, without referring to a specific court.

(judges, magistrates) who under Maine law might be empowered to adjust temporary custody.  See Me. Rev. Stat. Ann. tit. 4, § 183(1)(D)(2-A) (authorizing family law magistrates to modify the custody and contact provisions of protection from abuse orders in certain circumstances).  And the latter sentence might mean that the protection from abuse order would end when final custody was resolved by the Maine state court.

Yet "court of competent jurisdiction" does not by its terms refer only to Maine courts, and there are other reasons to think it is not so limited.[8]  And while "final FM order" might refer to a permanent custody order in the Maine state court, the phrase does not expressly say so and may be a generic reference to the type of matter rather than one to a Maine proceeding (see note 7, above).  In any event--given that the prior sentence may contemplate changes in temporary custody by a non-Maine court--it is hard to read this second sentence as requiring that final custody only be determined in Maine.

---

[8]Maine has enacted the Uniform Child Custody Jurisdiction and Enforcement Act, which conceives that courts elsewhere may modify or override a Maine state court's custody order under at least certain circumstances.  See Me. Rev. Stat. Ann. tit. 19, §§ 1735-1736, 1746-1747 (providing that custody determinations may be modified and that Maine courts' jurisdiction to do so ceases to be exclusive when "a court of another state," which includes a foreign country's court, "determines that the child, the child's parents and any person acting as a parent do not presently reside in [Maine]").

-18-

Above all, the provision in which the quoted language appears is directed to temporary custody for what, as the order elsewhere makes clear, was a limited period. Permanent custody is a different subject almost certainly of great importance to the parents and not one that would necessarily be addressed in any way in a consent order providing for temporary protection and custody. Whatever the language may mean, it is impossible to read it as an unequivocal agreement by Nicolson that permanent custody be determined in a Maine court and nowhere else.

In sum, we do not have here a "clear[] and unequivocal[]" expression of an agreement by Nicolson to have final custody determined in a Maine court, In re H. and Others, [1998] A.C. 72, nor "a convincing written renunciation of rights" to this effect, Friedrich, 78 F.3d at 1070. What Pappalardo obtained by consent was full temporary custody of the child at present with limited rights of contact by Nicolson. Nicolson might have forestalled even a temporary custody order by his Hague Convention proceeding because the Convention itself provides,

> After receiving notice of a wrongful . . . retention of a child . . . the judicial or administrative authorities of the Contracting State . . . in which [the child] has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

-19-

Art. 16 (emphasis added). But he chose for tactical reasons not to notify the state court of his Hague Convention petition before the state court order issued. This does not defeat his right under the Hague Convention to have permanent custody determined in Australia.

Because of the consent order, Pappalardo retains full temporary custody of the child even upon its return to Australia unless and until custody rights are adjusted by a court of competent jurisdiction. Indeed, Nicolson himself is subject under the protective order to stringent conditions which prevent him from direct contact with the child other than that allowed for by the order. The complications thus entailed provide further reason for the parties to seek, in their own interest and that of their child, a private resolution; but that is in their hands.

In fairness to Pappalardo, we note that there was no wrongful removal of the child and that Pappalardo's arguments in favor of retention are far from frivolous. On habitual residence and consent, she had reasonable evidence and arguments on her side; and the acquiescence issue turns on ambiguous language in a cryptic order. Counsel on each side presented arguments of the highest quality for which the court is duly grateful.

The judgment of the district court is <u>affirmed</u>. Each side shall bear its own costs on this appeal.

<u>It is so ordered.</u>