**Dawid MLYNARSKI, Petitioner**

v.

**Ewa PAWEZKA, Respondent.**

**Civil Action No. 11–30073–KPN.**

United States District Court,
D. Massachusetts.

March 13, 2013.

---

Mark I. Berson, Greenfield, MA, for Petitioner.

Thomas A. Kenefick, III, Law Office of Thomas A. Kenefick, III, Springfield, MA, for Respondent.

*MEMORANDUM AND ORDER WITH REGARD TO PETITIONER'S MOTION FOR AN ORDER TO RETURN THE MINOR CHILD TO POLISH JURISDICTION (Document No. 25)*

NEIMAN, United States Magistrate Judge.

Presently before the court is a dispute between David Mlynarski ("Petitioner") and Ewa Pawezka ("Respondent") regarding the removal of their minor son, A.M., from Poland to the United States. Pursuant to 42 U.S.C. 11603 of the International Child Abduction Remedies Act, Petitioner has filed a motion for an order to return his minor son to Poland after Respondent removed him and brought him to Massachusetts. The parties have consented to have the undersigned address all matters in this case pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P. 73. On February 20, 2013, the court held an evidentiary hearing on the motion. For the reasons that follow, the court will grant Petitioners motion to return A.M. to Poland and will order that Respondent do so promptly.

### I. BACKGROUND

Petitioner and Respondent are the biological parents of A.M., who was born on April 2, 2007. (Compl. 4; Exhibit A (attached to Petitioner's Compl.).) Although Petitioner and Respondent were never married, they resided in the same home in Poland, in the later stages of Respondent's pregnancy and until August 2, 2007, when Respondent left with A.M. and moved in with her aunt in the same town. (Compl. 4; Respondents Answer 5.) Respondent testified that before she "escaped" from the residence (Petitioner's parents' house), Petitioner held her captive in the base-ment where she was only able to eat the eggs and jam stored there. She also testified that during these several months Petitioner verbally and physically abused her and sexually abused the infant A.M.

Within months of leaving the residence, Respondent sought child support through the Polish court and began receiving approximately $100 per month. In or around February of 2008, however, a custody dispute arose. Petitioner filed an action to regulate his contact with A.M., while Respondent, represented by counsel, countersued to terminate Petitioners parental rights. (Correspondence from District Court in Stalowa Wola, October 9, 2012, at *3 ("Polish Court Correspondence").) In August of 2008, the Polish court received a psychological report from the Diagnostic and Consultation Family Center, which had conducted evaluations of Petitioner and Respondent at the court's request. (See Petitioners Hearing Exhibit 1.) The report indicated that, while Respondent was socially and emotionally immature, suffered from extreme helplessness, and made decisions regarding A.M. based on her emotions rather than his developmental needs, she fulfilled her duties as a mother and had a great bond with A.M. (*Id.* at 9–10.) As to Petitioner, the report stated that he could control his behavior but that he did not perceive, understand, or take responsibility for his own mistakes; the report also indicated that Petitioner had a high self-evaluation. (*Id.* at 10–11.) In light of these findings and others, the report concluded that, because of Respondents "low level of social and emotional maturity" and her resulting inability to "fully understand the minors needs," Petitioners contact with A.M. was "indispensable." (*Id.* at 15.) However, considering Petitioners own "low level of social maturity" and "susceptibility to taking psychoactive substances," the report recommended

that Petitioners visits with A.M. be facilitated in a controlled environment accompanied by the presence of a supervising court monitor. (*Id.* at 16.)

On February 19, 2009, after Respondent withdrew her request to terminate Petitioner's parental rights, the Polish court granted Petitioner supervised visitation with A.M. at specified dates and times. (Exhibit D (attached to Petitioner's Compl.) ¶ 2.) Following that order, the parties continued their ongoing legal battle over their respective rights. (Polish Court Correspondence.) Petitioner continued to seek the enforcement of the order regulating his contact with A.M., while Respondent continued her efforts to limit Petitioner's parental authority. (Polish Court Correspondence, at *3–6.)

In July of 2009, Respondent, after claiming that her intention was to bring A.M. to the United States for a short holiday visit, received permission from the Polish court to obtain a passport for him. (Exhibit E (attached to Petitioner's Compl.) at *5.) However, in March of 2010, after learning that Respondent applied for a permanent immigrant visa for A.M. as a child of a United States citizen—Respondent had become a United States citizen when, as a thirteen-year-old and living here, her father became a citizen—Petitioner sought to reverse the court's decision. Petitioner alleged that Respondent had been dishonest about her intentions to visit the United States for only one month. (*Id.*)

On March 15, 2010, the Polish court—concerned that there was a "high probability" that A.M. would stay in the United States permanently without Petitioner's consent—issued an order prohibiting Respondent from taking A.M. outside Poland until at least the completion of the court proceedings. (Exhibit E (attached to Petitioner's Compl.) at *1–2, 5.) Despite that order, Respondent left with A.M. and

brought him to the United States (Massachusetts) on April 4, 2010. (Respondent's Opposition at *3.) In all, Respondent, before removing A.M., had continued to reside in Poland for over two and one-half years after she left the residence where she had first resided with Petitioner. On March 23, 2011, Petitioner initiated the present action seeking A.M.'s return to Poland pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 24, 1980, T.I.A.S. No. 11670 ("Convention"), and 42 U.S.C. 11601 and 11603.

Respondent, the court notes, appealed the Polish court order prohibiting her from leaving Poland and traveling with A.M. to the United States. On June 16, 2011, long after Respondent removed A.M. to the United States, the Court of Appeals in Poland denied Respondents appeal, citing Petitioners interest in maintaining ties with his son; the court found that both parents "are entitled to parental authority over [A.M.] and each of them is obliged and also entitled to exercising the same." (Substantiation, at *5–6.) Respondent testified before this court that she had been represented by counsel throughout that appeal.

II. *Standard of Review*

A petitioner in an action brought under 42 U.S.C. 11603(b) must establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. 11603(e)(1). If the petitioner satisfies this initial burden, the respondent who opposes the return of the child must establish by clear and convincing evidence that one of the exceptions enumerated in Articles 13b or 20 of the Convention applies. *See* 42 U.S.C. 11603(e)(2)(A). Alternatively, the respondent may successfully oppose the return of the child by establishing by a

preponderance of the evidence that any other exception enumerated in Articles 12 or 13 of the Convention applies. *See* 42 U.S.C. 11603(e)(2)(B).

### III. DISCUSSION

■ The Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes. *See Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010). It seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States. Convention, Art. 1(a)-(b); *see generally Chafin v. Chafin,* —— U.S. ——, 133 S.Ct. 1017, 1020–21, 185 L.Ed.2d 1 (2013). A child is considered "wrongfully removed" when the removal is "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal" and "at the time of removal . . . those rights were actually exercised . . . or would have been so exercised but for the removal." Convention. at Art. 3(a)-(b).

■ To determine a child's place of habitual residence, a court must consider the parents shared intentions regarding their child's residence and look for a degree of settled purpose from the child's perspective. *See Zuker v. Andrews,* No. 98–1622, 1999 WL 525936, at *1 (1st Cir. 1999) (citing *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir.1995)). When determining a settled purpose, "[a]ll that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Feder,* 63 F.3d at 223. As to the question of "rights of custody," the Convention draws a distinction between a person's having "rights of custody" and

"rights of access." While a removal is considered "wrongful" when the child is "removed in violation of a person's 'rights of custody,'" it offers no return remedy if the removal is in breach of a person's "rights of access." *Abbott,* 130 S.Ct. at 1989. A person has "rights of custody" if he or she has "rights relating to the care . . . of the child and . . . the right to determine the child's place of residence." Convention, Art. 5(a). Moreover, a removal is only considered "wrongful" if the non-removing parent was actually exercising his or her rights of custody to the child or, alternatively, would have been exercising those rights but for the child's wrongful removal. *Id.* at Art. 3(b).

Given these various provisions, the instant petition requires the court, in short, to decide whether A.M. was "wrongfully removed" from Poland and retained in the United States as defined by the Convention and, if so, whether he should be permitted to remain in the United States under one of the Convention's enumerated exceptions.

### A. *Wrongful Removal of A.M.*

■ In his petition, Petitioner maintains that A.M. was wrongfully removed from Poland and improperly brought to Massachusetts in April of 2010. In support, Petitioner asserts that A.M. was a habitual resident of Poland and that he was exercising his custodial rights until A.M.'s removal. Although Respondent initially disputed that A.M. was "wrongfully removed," she conceded at the hearing that Petitioner satisfied his burden of demonstrating wrongful removal. The concession was appropriate. There is no question but that (1) A.M. was a habitual resident of Poland at the time of his removal, (2) Petitioner had "rights of custody" at the time, and (3) was actually exercising those rights. *See* Convention Art. 3; 42 U.S.C.

§ 11603(e)(1); *Nicolson v. Pappalardo,* 605 F.3d 100, 103 (1st Cir.2010). That said, the court has no choice but to order A.M.'s return to Poland unless Respondent can establish that one of the Convention's exceptions applies. The court now moves on to that analysis.

### B. *Respondents Exceptions*

Seeking to have A.M. remain in the United States, Respondent invokes two exceptions enumerated in the Convention. *See* Convention, Art. 13(a) and (b). First, Respondent claims that there would be a grave risk of physical and psychological harm to A.M. were he to be returned to Poland. Second, she argues that Petitioner "acquiesced" to A.M.'s residing in the United States.

### 1. *Grave Risk of Harm Exception*

■ Article 13(b) of the Convention states that return of the child is not required if the person opposing the return establishes that "there is a grave risk that [the child s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13(b). Under Article 13(b), a "grave risk" means a "more than serious" risk. *Danaipour v. McLarey,* 286 F.3d 1, 14 (1st Cir.2002); *see also* *Whallon v. Lynn,* 230 F.3d 450, 459 (1st Cir.2000) (grave means a great deal more than minimal); *Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir.2000) ("[T]he harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another'; otherwise, the goal of the Convention could be easily circumvented.").

■ Here, Respondent claims that Petitioner "sexualized" A.M. from the time of his birth in April of 2007 until she moved out of Petitioners home in August of that year. (Respondents Opposition at *2.) In support, Respondent submitted photographs Petitioner allegedly took of A.M.'s genitals when he was only several months old as well as a brief video (taken by Respondent) showing Petitioner, wearing one of Respondents dresses, gently swinging A.M. in his arms. (Respondent's Hearing Exhibits 1–4.) Respondent also testified that Petitioner would suck on A.M.'s penis when he cried in order to calm him, claiming this to be a Native American practice. (See also Respondents Answer 8.) She testified as well that Petitioner, when they resided together, often was under the influence of drugs when he cared for A.M. and, as a result, posed a risk to his safety.

■ The First Circuit has held that sexual abuse by a parent is an example of an Article 13(b) defense justifying nonreturn. *Danaipour,* 286 F.3d at 16. Drug use, under certain circumstances, also may qualify as grave-risk conduct. *Cf. In re Hague Application,* 2007 WL 4593502, at *11 (E.D.Mo. Dec. 28, 2007) (the petitioner's "prior drug use was outside the home and not in front of the children"). Accordingly, the court must first determine whether the alleged sexual abuse and drug use in fact occurred. *Danaipour,* 286 F.3d at 15 (noting that the task of making a "grave risk" determination requires the court to make subsidiary factual findings). Beyond that, the court must consider as part of the grave risk analysis how such conduct, if confirmed, would affect the child were he to be returned to his habitual residence. *See Danaipour,* 286 F.3d at 15 ("The question under the Convention is the effect of return on these particular children"); *cf. Walsh,* 221 F.3d at 219 (grave risk exception considers where and how a child will be returned). In effect, should Respondent's allegations of grave risk be proven, the court still needs to determine whether A.M. could be returned

safely despite the identified risks. *See Danaipour*, 286 F.3d at 19.

The evidence proffered by Respondent with regard to Petitioner's drug use includes her own testimony and the psychological report provided to the Polish court. The report indicates that Petitioner had a "susceptibility to taking psychoactive substances," smoked marijuana occasionally, but had ceased doing so in August of 2007 when asked by Respondent. (See Petitioners Hearing Exhibit 1 at 14, 16.) The court credits that evidence accordingly.

Respondent's allegations of sexual abuse, on the other hand, are far less persuasive. First, there is no mention of such abuse in the psychological report issued to the Polish court. Granted, Respondent testified that she was reluctant to bring this to the attention of the psychologist, but nonetheless the fact remains that no such information is contained in the report. Second, certain of Petitioner's photographs of A.M. while an infant, although questionable, do not amount, in the court's opinion, to sexual "abuse." Third, the allegations of Petitioner's engaging in what he described as a "Native American" practice, if practice it be, are disturbing but nonetheless vague and uncorroborated; had Respondent been as concerned about this at the time as she is presently, it is curious that she did not insist on sharing that information with the investigating psychologist.

Fourth and most importantly perhaps, Respondent has not testified to or set forth any probative evidence to support her contention that, were A.M. to return to Poland, he would "certainly be at risk for more of the same type of abuse." (Respondents Opposition at *2.) She has offered little if any evidence, let alone testimony, arising after August of 2007 (when she left Petitioner's residence) to support her assertion that A.M. would remain at risk. Again, all of Respondent's most serious allegations concern events during A.M.'s first four months. To be sure, Respondent described herself as having been an "indentured servant" during that time, when she was but seventeen years of age and separated from her own family. But years have passed since then (Respondent is now twenty-four), during which time the Polish court considered somewhat similar allegations and nonetheless granted Petitioner custodial visitation, albeit quite limited. The Polish court was also responsive to Respondent's concerns about the first court monitor, leading it to appoint another. Despite this oversight by the court, however, Respondent chose unilaterally to remove A.M. from Poland in contravention of the court's order.

Respondent, it should be noted, emphasized these limited visitations in yet another context, namely, her assertion that Petitioner had no "rights of custody." That argument, however, has been abandoned by her. As a result, absent any evidence that Petitioner failed to comply in the past or would fail to comply in the future with the supervised visitation order still in effect in Poland, this court is not convinced that A.M.'s return would expose him to "more of the same type of abuse." *Compare Walsh*, 221 F.3d at 220–221 (concluding that Irish and American court orders were insufficient to protect the children from exposure to grave risk of harm because of the petitioners history of violating such orders). That claim on Respondent's part, in the court's view, is pure speculation.

■ Persevering, Respondent argues that returning A.M. to Poland would nonetheless expose him to a grave risk of harm because he is "well settled" in the United States. Article 12 of the Convention, in fact, provides as an exception that, if more than one year has elapsed from the date of

wrongful removal before proceedings to return the child are commenced, the judicial or administrative authority shall "order the return of the child, unless it is demonstrated that the child is now settled in [his or her] new environment." Convention, Art. 12. At the hearing, however, Respondent acknowledged that, given the timing of the instant petition, this exception does not apply. Still, Respondent argues, the court should consider the "well-settled" doctrine in the context of her grave risk argument. In support, Respondent cites *Blondin v. Dubois,* 238 F.3d 153, 164 (2d Cir.2001), which held that a court may consider evidence that the child is "so deeply rooted in the United States" that there would be a grave risk of psychological harm if the child were to be returned to the home country.

■ The First Circuit, however, in a ruling which is binding on this court, has chosen to "disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States." *Walsh,* 221 F.3d at 222 n. 14. "That," the First Circuit stated, "is an inevitable consequence of removal." *Id.* As Judge George O'Toole later explained in *McManus v. McManus,* 354 F.Supp.2d 62 (D.Mass.2005), "[a] removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. It is the abduction that causes the pangs of subsequent return." *Id.* at 69 (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1068 (6th Cir.1996)). Such is the case here as well.

In any event, the situation in the case at bar is quite distinguishable from *Blondin.* There, the respondent submitted an expert's report which found that the children at issue were "recovering from the sustained, repeated traumatic state created in France by [the petitioners] physically and emotionally abusive treatment" and that, if they were returned, they would suffer a recurrence of their traumatic stress disorder; their return, the expert concluded, "would undo the benefit of the psychological and emotional roots [the children] have established with their mother and her extended family, which has resulted in the beginning of a full recovery from their severe trauma in France." *Blondin,* 238 F.3d at 159–60.

Here, the facts are significantly different. Respondent has not alleged that A.M. suffers from a traumatic stress disorder or is recovering from such a disorder. Neither has Respondent proffered any expert evidence or other testimony to support her contention that A.M.'s return at this time would expose him to a grave risk of psychological harm. At most, Respondent introduced some letters from neighbors and friends which attest to her being a good mother. (Respondent's Hearing Exhibit 7.) The court is more than willing to accept those attestations, but Respondent's favorable qualities as a mother do little to demonstrate that A.M. would face a grave risk of harm were he to return to Poland. To the contrary, as she herself testified, not only is A.M. bilingual but Respondent has family who continue to reside in Poland, including her mother, sister, grandmother, aunt and uncle.

■ Respondent's one remaining justification to remain in the United States is her concern that the Polish court system is ill-prepared to protect A.M. In support, Respondent cites a report prepared by the United States Department of State that discusses Poland's problems with domestic violence against women and low conviction rates in cases involving incidents of child abuse. See Country Reports on Human Rights Practices (2011), http://www.state.

gov/documents/organization/186602.pdf. This, however, is evidence of the weakest sort. Simply put, the court is not convinced that the report sufficiently demonstrates that the Polish court system is incapable of enforcing its visitation orders or of protecting A.M. from abuse during the pendency of the parties' dispute. Even if there is merit to some of Respondent's concerns, concerns which she can raise with the court in Poland, A.M. will not be in Petitioners sole or unsupervised custody given the existing visitation order. *See Walsh,* 221 F.3d at 219 (even if a court determines that a child's return could expose him or her to a grave risk of harm, the court may, under Article 13(b), consider whether the grave risk can "be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings").

In sum, the court finds that Respondent has failed to meet her burden to establish by clear and convincing evidence that A.M.'s return to Poland would expose him to a "grave risk of physical or psychological harm or otherwise place [him] in an intolerable situation." Convention, Art. 13(b).

### 2. *Acquiescence*

■ As a final matter, Respondent asserts that Petitioner "acquiesced" to A.M.'s living in the United States by his complete lack of communication or even an attempt to communicate with [Respondent], the child, or any member of [Respondents] extended family here in the United States. (Respondents Opposition at *3.) In particular, Respondent claims that even though Petitioner had her relatives contact information in the United States and her own email addresses, he made no effort to contact them. Although Respondent did not press this argument at the hearing, the court will address it nonetheless.

■ The Convention provides that if "the person . . . had consented to or subsequently acquiesced in the removal or retention," a court is not bound to order the return of the child. Convention, Art. 13(a). To establish "acquiescence" here, Respondent must show that Petitioners "subjective intent" was to acquiesce to A.M.'s living in the United States. *Nicolson,* 605 F.3d at 107.

Respondent's argument is not persuasive. Even if her assertions are true, a lack of communication, by itself, is not sufficient to establish that it was Petitioners subjective intent to acquiesce to A.M.'s living in the United States. First, a person's lack of communication does not necessarily indicate that a person has not tried to make contact with another person; emails are not always received and telephone calls are not always answered. Respondent herself had lost contact with her own attorney here, leading him to temporarily withdraw from this case and causing the court to default her on November 3, 2011. Further, it is not unreasonable to believe that, had Petitioner made efforts to communicate with A.M., his efforts would have been rebuffed. The evidence indicates that Respondent made continuous efforts to either terminate Petitioners parental rights or, at least, significantly reduce his visitation rights; she also pursued an appeal in Poland while she remained here in the United States. Thus, even if credited, Petitioners lack of communication is at best an ambiguous indication of his intention to allow A.M. to permanently reside in the United States.

■ Finally, it must be remembered that the Convention's exceptions, including acquiescence, are to be narrowly construed. *See Nicolson,* 605 F.3d at 105 ("The exceptions are 'narrow' and must be

narrowly construed." (quoting 42 U.S.C. § 11601(a)(4))). Because Respondent has only offered Petitioner's ambiguous conduct in support of her acquiescence claim, she has not satisfied her burden of establishing this exception. *See Whallon,* 230 F.3d at 461 n. 13 (noting that "cases where courts have granted this affirmative defense have all involved clear instances of waiver by the party seeking the child's return.").

## IV. CONCLUSION

For the reasons stated, Petitioner's motion for an order to return the minor child to Polish jurisdiction is GRANTED. The court further ORDERS Respondent to promptly and no later than May 1, 2013, arrange to return with A.M. to Poland and submit to the jurisdiction of the Polish court where the custodial issues had been addressed. In addition, Respondent is hereby ORDERED to notify this court in writing by April 15, 2013, as to what arrangements have been made to comply with this order. Furthermore, the parties' counsel shall certify in writing by May 15, 2013, that the parties have re-submitted themselves to the jurisdiction of the Polish court.

IT IS SO ORDERED.